1
2
3
4
5
6
7

8          **UNITED STATES DISTRICT COURT**

9          **EASTERN DISTRICT OF CALIFORNIA**

10

11   STYAUNO CARTER,                    )   Case No.: 1:13-cv-00782 - JLT
                                        )
12              Plaintiff,              )   ORDER DIRECTING ENTRY OF JUDGMENT IN
                                        )   FAVOR OF DEFENDANT CAROLYN COLVIN,
13        v.                            )   ACTING COMMISSIONER OF SOCIAL
                                        )   SECURITY, AND AGAINST PLAINTIFF
14   CAROLYN W. COLVIN,                 )
     Acting Commissioner of Social Security,  )
15                                      )
                Defendant.              )
16   _____   )

17        Plaintiff Styauno Carter asserts he is entitled to a supplemental security income under Title XVI

18   of the Social Security Act.  Plaintiff asserts the administrative law judge ("ALJ") erred in evaluating

19   the validity of his IQ scores.  Because the ALJ set forth sufficient reasons supported by substantial

20   evidence in the record, the ALJ's decision is **AFFIRMED**.

21                                **BACKGROUND**

22        Plaintiff filed his application for benefits on February 10, 2010, alleging disability beginning

23   January 1, 2008.  (Doc. 11-6 at 2.)  His application was denied by the Social Security Administration

24   initially on July 26, 2010, and upon reconsideration on December 14, 2010.  (Doc. 11-3 at 13.)  After

25   requesting a hearing, Plaintiff testified before ALJ on February 9, 2012.  (*Id.* at 38.)  The ALJ found

26   Plaintiff was not disabled under the Social Security Act, and issued an order denying benefits on

27   February 9, 2012.  (*Id.* at 13-26.)  The Appeals Council denied Plaintiff's request for review of the

28

                                          1

decision on April 19, 2013.  (*Id.* at 4-6.)  Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security ("Commissioner").

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act.  When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error.  42 U.S.C. § 405(g).  The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion."  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).  The burden of proof is on a claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).  If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment.  *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

**ADMINISTRATIVE DETERMINATION**

The Commissioner evaluates a claimant's alleged disability using the sequential five-step process. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

**A.     Relevant Medical Evidence**[1]

Dr. Ekram Michiel performed a consultative psychiatric examination on August 30, 2008. (Doc. 11-8 at 2-5.) Plaintiff told Dr. Michiel: "I can't remember things. I have mood swings. I get angry. I can't control myself." (*Id.* at 2.) In addition, Plaintiff reported he heard voices "all the time," saying he was "a failure." (*Id.*) He reported he had "[n]o past psychiatric hospitalization," but "received psychiatric services while in prison." (*Id.*) Plaintiff estimated that he smoked "40 cigarettes a day," and reported that he previously used PCP and cocaine. (*Id.*) Plaintiff said he was "able to take care of his personal hygiene" and "do household chores." (*Id.*)

Upon examination, Dr. Michiel found Plaintiff "could recall three out of three objects in five minutes." (Doc. 11-8 at 3.) Plaintiff's "[t]hought process was goal-directed," and his "[t]hought content was not delusional." (*Id.*) Dr. Michiel noted:

> Based upon the evaluation and observation throughout the interview, I believe that the claimant is able to maintain attention and concentration and carry out simple job instructions.
>
> The claimant is able to relate and interact with coworkers, supervisors and the general public.
>
> The claimant is unable to carry out an extensive variety of technical and/or complex instructions.

(*Id.* at 4.) Further, Dr. Michiel believed Plaintiff was "able to handle his own funds." (*Id.*) Dr. Michiel

---

[1] Because Plaintiff does not challenge the findings of the ALJ related to his physical limitations, the Court summarizes only the medical evidence related to his mental impairments.

3

gave Plaintiff a GAF score of 60 (*id.*), thereby indicating Plaintiff had "moderate symptoms … OR moderate difficulty in social, occupational, or school functioning." *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.)

Dr. Jennifer Eggert completed a psychological evaluation on May 21, 2010, which included administration of the Wechsler Adult Intelligence Scale – 4th edition (WAIS-IV); Wechsler Memory Scale – 4th edition (WMS-IV); Bender Visual Motor Gestalt Test, 2nd edition (Bender-Gestalt-II); and the Trial Making Test. (Doc. 11-8 at 12-18.) Plaintiff reported that he felt afraid and had "trouble concentrating, poor memory, and auditory hallucinations." (*Id.* at 12.) He said he was hospitalized during his incarceration and received a prescription for Risperidone, which Dr. Eggert noted was "typically prescribed to manage mood and psychotic symptoms." (*Id.* at 13.) Plaintiff told Dr. Eggert that he was "placed in special education," and he "completed the 12th grade and earned his diploma." (*Id.*) He "denie[d] current use of cigarettes, alcohol, and substances." (*Id.*) Dr. Eggert noted Plaintiff stated that his mother helped "with household chores, cooking, errands, and shopping." (*Id.* at 14.)

Dr. Eggert determined Plaintiff had a full scale IQ score of 49, verbal IQ score of 63, and a performance IQ score of 51. (Doc. 11-8 at 15.) Dr. Eggert noted: "The test results indicate severe impairment in claimant's overall cognitive functioning. His verbal comprehension, perceptual reasoning, working memory, and processing speed abilities all fell in the extremely low range of functioning." (*Id.*) Further, Dr. Eggert believed that Plaintiff's results on the WMS-IV "indicate[d] severe impairment in [his] overall ability to learn and recall new information." (*Id.* at 16.) She opined the results indicated Plaintiff had a "severe impairment in overall cognitive functioning." (*Id.* at 17.) Dr. Eggert observed: "During the evaluation claimant did exhibited difficulty understanding, carrying out, and remembering simple and complex instructions. He was not able to maintain attention and concentration for the duration of the valuation. He demonstrated difficulty with pace and persistence." (*Id.*) She concluded Plaintiff "appear[ed] unable to be successful at maintaining the skills required to carry out tasks and maintain relationships in a work setting," and that Plaintiff did "not appear capable of managing his funds independently." (*Id.*)

On July 19, 2010, Dr. Garcia completed a psychiatric review technique form and mental residual functional capacity assessment. (Doc. 11-8 at 23-36.) Dr. Garcia opined that Plaintiff had

mild restriction of activities of daily living; mild difficulties in maintaining social functioning; and

moderate difficulties in maintaining concentration, persistence, or pace. (*Id.* at 31.) Dr. Garcia believed

Plaintiff was "not significantly limited" with his ability to understand, remember, and carry out very

short and simple instructions, but was "moderately limited" with detailed instructions. (*Id.* at 34.)

According to Dr. Garcia, Plaintiff was "not significantly limited" in all other areas of sustained

concentration and persistence. (*Id.* at 34-35.) Dr. Garcia found Plaintiff was: "Able to perform simple,

repetitive tasks. Able to maintain concentration, persistence and pace. Able to adapt to work changes

and relate to supervisors, coworkers and the general public." (*Id.* at 36.)

Dr. Greg Ikawa reviewed Plaintiff's records and affirmed the assessment of Dr. Garcia on

December 13, 2010. (Doc. 11-8 at 67-68.) Dr. Ikawa noted: "Though psychological testing did take

place and testing was very low," the psychologist did not identify a medically determinable

impairment. (*Id.* at 68.) Dr. Ikawa noted that although Plaintiff told Dr. Eggert that he was in special

education classes, his mother "confirm[ed] that claimant was not in special ed." (*Id.*) Further,

Plaintiff's activities of daily living were "not in line with [his] IQ score," because he "takes the bus, is

able to handle money as he reports that he has gotten money orders." (*Id.*) Therefore, Dr. Ikawa opined

Plaintiff was able to sustain simple, repetitive tasks. (*Id.*)

**B.    Administrative Hearing Testimony**

Plaintiff testified at the administrative hearing on February 9, 2012. (Doc. 11-3 at 44.) He

reported that he completed the twelfth grade in high school, and he was able to read, write, and do

simple math. (*Id.*) Plaintiff stated that he was not in special education classes in school, although he

admitted to telling some of the examiners that he had been in special education. (*Id.* at 44-45.)

Plaintiff explained he meant that he was "in a special education program, like a after-school program

or whatnot." (*Id.* at 45.) He reported holding several part-time positions over the past 15 years

including telemarketing, cleaning for a pipe supply company, and assembly line work, but Plaintiff

had not done any full-time work. (*Id.* at 46, 66.)

He believed he was unable to work due to back pain and "bad nerves." (Doc. 11-3 at 47.)

Plaintiff said he was ashamed of how his back looked with scoliosis. (*Id.*) Further, Plaintiff said he

was "a close-minded person" with "a deep past" because he was molested as a child. (*Id.* at 48.)

1   Plaintiff testified that there were "a lot of things that [he was] going through right now," because his

2   mother had passed away within the last year.  (*Id.* at 49.)

3        Plaintiff said on a typical day, he would sit in his La-Z-Boy chair and "watch sports a lot" on

4   channels such as ESPN, NFL Network, and NBA TV (Doc. 11-3 at 51, 54.)  He said he and his wife

5   "play[ed] a lot of games at home," such as Monopoly.  (Doc. 11-3 at 57.)  Plaintiff stated that his wife

6   fixed meals and he would "try to get up sometime[s] . . . help her out," such as by wiping of the tables

7   and vacuuming "here and there."  (*Id.* at 51, 56.)  Plaintiff reported his wife did the laundry and grocery

8   shopping.  (*Id.* at 55-56.)  Although Plaintiff would sometimes accompany his wife to the store, he said

9   he would not pick up groceries unless they were light items.  (*Id.* at 56.)

10        According to Plaintiff, his wife was "a Bible scholar," and they studied the Bible together at

11   home.  (Doc. 11-3 at 57.)  He said that he went to church "once or twice a month."  (*Id.*)  Plaintiff

12   reported that he was able to take public transportation, and would do so to visit the doctor or pick up

13   medication.  (Doc. 11-3 at 44, 50.)

14        Plaintiff stated that he talked to "about three or four friends a day on the phone," and had

15   visitors a couple of days each week. (Doc. 11-3 at 54-55.)  Plaintiff said his four grandchildren visited

16   "[a]lmost every weekend" and he would "try to sit down and play little cars with them or some games

17   or something," but he was "just a couch potato" when they were visiting.  (*Id.* at 53-54.)  Plaintiff

18   testified it hurt to not be able to "do the things that [he] used to do," which caused him to "feel

19   depressed."  (*Id.* at 52.)

20        He reported that he previously used cocaine, but last used it "about two and a half years" before

21   the hearing.  (Doc. 11-3 at 59.)  Plaintiff said he that he smoked marijuana "almost every day," but last

22   smoked it "about a month and a half" before the hearing date.  (*Id.* at 58.)  Plaintiff explained that he

23   made a promise to his father to do better, and quit smoking marijuana on his father's birthday.  (*Id.* at

24   59.)

25        Plaintiff said he had difficulty concentrating and his mind "veers off a lot."  (Doc. 11-3 at 61,

26   62.)  He explained that "the easiest job that [he] did . . . was telemarketing," but he "would forget the

27   lines."  (*Id.* at 66.)

28   *///*

6

1    C.    **The ALJ's Findings**

2           Pursuant to the five-step process, the ALJ determined first that Plaintiff had not engaged in

3    substantial activity after the application date of February 10, 2010. (Doc. 11-3 at 15.)  Second, the ALJ

4    found Plaintiff's severe impairments included "mild to moderate dynamic thoracolumbar scoliosis;

5    psychotic disorder; depressive disorder; cocaine, alcohol and phencyclidine dependence sustained

6    remission by history; and active marijuana use."  (*Id.*)  Third, the ALJ found Plaintiff did not have an

7    impairment or a combination of impairments that met or medically equaled a Listing.  (*Id.* at 15-16.)

8    Next, the ALJ determined:

9           [T]he claimant has the residual functional capacity to perform medium work as defined
           in 20 CFR 416.967(c) except he can lift and carry 25 pounds frequently and 50 pounds
10          occasionally; can stand, walk, and sit for six hours, each, during an eight-hour workday;
           can frequently climb stairs, ramps, ladders, balance, kneel, and crawl; can occasionally
11          stoop and crouch; can perform simple tasks consistent with SVP2 entry level work, as
           defined in the DOT; and can make simple work-related decisions with occasional
12          workplace changes.

13   (*Id.* at 18.)  With residual functional capacity, the ALJ found at step four that Plaintiff was "capable of

14   performing past relevant work as an industrial cleaner, a cannery worker or a sorter of agricultural

15   produce, and a poultry dresser."  (*Id.* at 23.)  Further, Plaintiff could perform "other jobs that exist in

16   significant numbers in the national economy."  (*Id.* at 24-25.)  Thus, the ALJ concluded Plaintiff was

17   not "under a disability, as defined in the Social Security Act, since February 10, 2010, the date the

18   application was filed."  (*Id.* at 25.)

19                                   **DISCUSSION AND ANALYSIS**

20          The ALJ rejected the opinion of consultative examiner Dr. Eggert, and found the assessed IQ

21   scores were not valid.  (Doc. 11-3 at 17-22.)  Specifically, the ALJ determined Plaintiff did not satisfy

22   the requirements of Listing 12.05 at step three of the sequential evaluation because Plaintiff "not have a

23   valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment

24   imposing an additional and significant work-related limitation of function."  (*Id.* at 17-18.)  The ALJ

25   found Plaintiff's IQ scores were "not an accurate measure of the claimant's intellectual functioning and

26   capacity based on the record as a whole."  (*Id.* at 17-18.)  Plaintiff asserts the ALJ's rejection of the IQ

27   scores and Dr. Eggert's opinion was improper, and that the ALJ failed to properly assess whether

28   Plaintiff satisfied Listing 12.05.  (Doc. 14 at 6-10.)

7

**A.      Rejection of Dr. Eggert's Opinion**

In this circuit, the courts distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). In general, the opinion of a treating physician is afforded the greatest weight but it is not binding on the ultimate issue of a disability. *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Further, an examining physician's opinion is given more weight than the opinion of non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Thus, the courts apply a hierarchy to the opinions offered by physicians.

A physician's opinion is not binding upon the ALJ, and may be discounted whether another physician contradicts the opinion. *Magallanes*, 881 F.2d at 751. When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The ALJ's resolution of the conflict must be upheld by the Court when there is "more than one rational interpretation of the evidence." *Id.; see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ"). The opinion of a physician may be rejected with "specific and legitimate" reasons, supported by substantial evidence in the record. *Lester*, 81 F.3d at 830; *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002). Because the opinion of Dr. Eggert conflicted with the opinions of Drs. Michiel, Garcia, and Ikawa, the ALJ was required to set forth specific and legitimate reasons for rejecting Dr. Eggert's opinion.

The ALJ gave "no weight to the opinion of consultative examiner Dr. Eggert." (Doc. 11-3 at 23.) The ALJ determined the opinion was "inconsistent with the claimant's reported activities of daily living, the lack of mental health treatment history, and unsupported by the medical evidence as a whole." (*Id.*) The Ninth Circuit has determined that these may constitute specific and legitimate reasons for rejecting a physician's opinion. *See*, *e.g.*, *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001); *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988).

1              1.      Plaintiff's activities

2          The opinion of a treating physician may be given less weight when the physician sets forth

3    restrictions that "appear to be inconsistent with the level of activity that [the claimant] engaged in."

4    *Rollins*, 261 F.3d at 856.  Here, the ALJ noted that Plaintiff told Dr. Eggert he "does not relate with

5    family, friends or neighbors," and she opined he would be "unable to be successful at maintaining the

6    skills required to carry out tasks and maintain relationships in a work setting."  (Doc. 11-3 at 21, 23.)

7    However, Plaintiff told the Administration that "he talks on the phone every day, all day, to others,

8    goes to church twice a month, and specifically stated that he does not have problems getting along with

9    family, friends and neighbors."  (Doc. 11-3 at 21.)  Plaintiff said he spent his days watching sports on

10   television, playing Monopoly with his wife, and "reported no difficulties with his concentration and

11   attention in doing so." (*Id.* at 18.)  Further, Dr. Eggert concluded Plaintiff did "not appear capable of

12   managing his funds independently" (Doc. 11-8 at 17), but Plaintiff would "go[] to thrift stores for hours

13   at a time, handling money independently."  (Doc. 11-3 at 18, citing Doc. 11-7 at 16-23.)  Because

14   Plaintiff's reported daily activities exceeded the limitations assessed by Dr. Eggert, the level of activity

15   supports the ALJ's decision to reject Dr. Eggert's opinion.

16              2.      Medical record as a whole

17         The Ninth Circuit has determined an ALJ may reject a medical opinion when it is "unsupported

18   by the record as a whole."  *Batson v. Comm'r of the Soc. Sec. Admin.,* 359 F.3d 1190, 1195 (9th Cir.

19   2003); *see also Morgan*, 169 F.3d 595, 602-03 (9th Cir. 1999) (a medical opinion's inconsistency with

20   the overall record constitutes a legitimate reason for discounting the opinion).  Importantly, however,

21   when an ALJ believes a physician's opinion is unsupported by the record, the "ALJ must do more than

22   offer [her] conclusions."  *Embrey*, 849 F.2d at 421.  The ALJ has a burden to "set[] out a detailed and

23   thorough summary of the facts and conflicting clinical evidence, stating [her] interpretation thereof, and

24   making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1983).  The Ninth Circuit explained:

25   "To say that medical opinions are not supported by sufficient objective findings or are contrary to the

26   preponderant conclusions mandated by the objective findings does not achieve the level of specificity

27   our prior cases have required."  *Embrey*, 849 F.2d at 421-22.  Here, the ALJ carried her burden to

28   identify conflicting evidence.

The ALJ observed that Dr. Michiel found Plaintiff had "intact memory" and "goal directed thought process." (Doc. 11-3 at 23.)  In addition, Dr. Michiel determined Plaintiff "could maintain attention and concentration to carry out simple job instructions, but not complex ones, that he could relate and interact with coworkers, supervisors and the general public, and that he is able to manage his own funds." (*Id.* at 23.)  In contrast, the ALJ noted that Dr. Eggert opined Plaintiff had a "poor memory;" "would have difficulty understanding, carrying out and remembering both complex and simple instructions;" and "would have moderate impairment in interacting with the public supervisors and coworkers." (*Id.* at 21, 23.)

Significantly, Dr. Michiel was also an examining physician, as was Dr. Eggert.  An "ALJ is entitled to choose between differing medical opinions of equal weight.  Indeed, that is the ALJ's function." *Williams v. Astrue*, 2010 U.S. Dist. LEXIS 93511, at *16 (N.D. Cal. Sept. 8, 2010) (citing *Andrews v. Shalala*, 53 F.3d 1035, 1042-43 (9th Cir. 1995)).  The ALJ's decision to give greater weight to the opinion of Dr. Michiel over the opinion of Dr. Eggert is supported by substantial evidence in the record.  The term "substantial evidence" "describes a quality of evidence ... intended to indicate that the evidence that is inconsistent with the opinion *need not* prove by a preponderance that the opinion is wrong."  1996 SSR 4 LEXIS 9 at *8.  Rather, "[i]t need only be such relevant evidence as a reasonable mind would accept as adequate to support a conclusion that is contrary to the conclusion expressed in the medical opinion." *Id.*

Dr. Michiel's opinions—that Plaintiff had a good memory and was able to understand, remember, and carry out simple instructions—were formed after considering the results of independent clinical tests and observations.  Dr. Michiel found Plaintiff "could recall three out of three objects in five minutes." (Doc. 11-8 at 3.) Such a memory recall test is commonly used by medical professionals to determine the effect of a claimant's alleged mental impairments. *See, e.g., Louis v. Astrue*, 2011 U.S. Dist. LEXIS 89834, at *17 (E.D. Cal. Aug. 12, 2011) (the consultative medical examiner noted the claimant's "[m]emory recall was three of three words immediately and two of three words after five minutes"); *Spain v. Astrue*, 2012 U.S. Dist. LEXIS 99311, at *24 (E.D. Cal. July 17, 2012) (the psychiatric consultative examiner found the claimant's memory and concentration span were within normal limits where the claimant "was able to recall three of three objects in three minutes"); *Randall*

10

*v. Astrue*, 2012 U.S. Dist. LEXIS 105952, at \*24 (E.D. Cal. July 20, 2012) (noting the claimant's "recent memory was impaired" where "she could remember one out of three objects after a few minutes").

Moreover, as explained by the Ninth Circuit, the opinions of non-examining physicians "may constitute substantial evidence when it is consistent with other independent evidence in the record." *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).  Here, Drs. Garcia and Ikawa reviewed the records and test results, and opined that Plaintiff was able to maintain concentration, persistence and pace sufficient to perform simple, repetitive tasks.  (Doc. 11-8 at 36, 68.)  Accordingly, their opinions were consistent with the opinion of Dr. Michiel, and are substantial evidence in support of the residual functional capacity set forth by the ALJ.  *Tonapetyan*, 242 F.3d at 1149; *Andrews*, 53 F.3d at 1042.

### B.    Plaintiff's IQ Scores

As noted above, the ALJ found the IQ scores from Dr. Eggert were "not an accurate measure of the claimant's intellectual functioning and capacity based on the record as a whole."  (Doc. 11-3 at 17-18.)  The Ninth Circuit recognizes that an ALJ may find an IQ score is not valid, but has not yet identified factors that may be considered to determine the validity of IQ scores.  *See Thresher v. Astrue*, 283 Fed. App'x 473, 475 n. 6 (2008) (noting the Court "do[es] not doubt that an ALJ can decid that an IQ score is invalid," but the Court "never decided what information is appropriately looked to in deciding validity").  As observed by the Ninth Circuit:

> Some courts have said that the score can be questioned on the basis of "other evidence," but have not discussed exactly how other evidence impacts the validity of the score itself. *See, e.g.*, *Clark v. Apfel*, 141 F.3d 1253, 1255-56 (8th Cir. 1998); *Popp v. Heckler*, 779 F.2d 1497, 1499-1500 (11th Cir. 1986) (per curiam). Other courts have been more explicit and have indicated that in questioning a score the ALJ must find some empirical link between the evidence and the score. *See Brown v. Secretary of HHS*, 948 F.2d 268, 270 (6th Cir. 1991); *see also Markle v. Barnhart*, 324 F.3d 182, 187 (3d Cir. 2003) (activities of claimant were not inconsistent with scores); *Muse v. Sullivan*, 925 F.2d 785, 789-90 (5th Cir. 1991) (per curiam) (test conditions suggested invalidity).

*Thresner*, 283 F3d. App'x at 457 n.6.

Consequently, other Circuit Courts permit the ALJ to use several factors to assess the validity of IQ test results.  For example, the Eighth Circuit permits an ALJ to "disregard rest scores that are inconsistent with an applicant's demonstrated activities and abilities as reflected in the record as a whole."  *Clay v. Barnhart*, 417 F.3d 922, 929 (8th Cir. 2005) (citing *Muncy v. Apfel*, 247 F.3d 728, 733

(8th Cir. 2001); *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)).  Similarly, the Third Circuit permits an ALJ to "reject scores that are inconsistent with the record" and a claimant's level of activity, but the ALJ may not "'reject IQ scores based on personal observations of the claimant and speculative inferences drawn from the record.'"  *Markle*, 324 F.3d at 187 (quoting *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000)).  The court may also consider whether there is evidence of malingering.  *Popp*, 779 F.2d at 1499-1500 (11th Cir. 1986).[2]

        Here, as discussed above, the ALJ found Plaintiff's "reported activities of daily living are not in line with th[e] IQ score[s]."  (Doc. 11-3 at 18.)  As the ALJ observed, Plaintiff was "able to take the bus alone, going to thrift stores for hours at a time, [and] handling money independently."  (*Id.*)  Further, Plaintiff testified that he played board games such as Monopoly with his wife, studying the Bible with his wife, and playing games with his grandchildren.  (*Id.*)  Finally, the ALJ observed that Plaintiff not in special education classes and "graduated high school with a normal degree."  (*Id.*)  Moreover, the ALJ articulated specific and legitimate reasons for rejecting the opinion of Dr. Eggert.  Consequently, the ALJ has carried her burden to identify legally sufficient reasons for finding the IQ scores assessed by Dr. Eggert were invalid.  *See Clay v. Barnhart*, 417 F.3d at 929; *Clark*, 141 F.3d at 1255; *Markle*, 324 F.3d at 187; *see also* 20 C.F.R. Subpart P, App'x 1, Listing 12.00(D)(5)(c) (explaining to claimants that "[i]n considering the validity of a test result, [the administration] should note and resolve any discrepancies between formal test results and the individual's customary behavior and daily activities").  Because the ALJ did not erred in assessing the validity of his IQ scores, the ALJ did not err in finding Plaintiff fails to satisfy the requirements of Listing 12.05.

## CONCLUSION AND ORDER

        The ALJ set forth specific and legitimate reasons for rejecting the opinion of Dr. Eggert in favor of the assessment offered by Dr. Michiel, also an examining physician.  In addition, the ALJ properly considered Plaintiff's level of activity to determine that Plaintiff's IQ scores were not valid.  Because

---

[2] Notably, it does not appear that Dr. Eggert evaluated whether Plaintiff was malingering.  Though Dr. Eggert concludes that "[t]hese results are considered to be a fair representation of his current psychological functioning" (Doc. 11-8 at 14), she does not explain this statement or detail upon what evidence it is based.

the ALJ applied the proper legal standards and substantial evidence supports his findings, the ALJ's determination that Plaintiff is not disabled must be upheld by the Court.  *See Sanchez*, 812 F.2d at 510.

Accordingly, **IT IS HEREBY ORDERED**:

1.      The decision of the Commissioner of Social Security is **AFFIRMED**;

2.      The Clerk of Court is DIRECTED to enter judgment in favor of Defendant Carolyn Colvin, Acting Commissioner of Social Security, and against Plaintiff Styauno Carter.

IT IS SO ORDERED.

Dated:   **December 16, 2014**           **/s/ Jennifer L. Thurston**
                                  UNITED STATES MAGISTRATE JUDGE